Judith Studer, Attorney No. 5-2174
SCHWARTZ, BON, WALKER & STUDER, LLC
141 South Center Street, Suite 500
Casper, WY 82601
Telephone (307) 235-6681
Fax (307) 234-5099
jstuder@schwartzbon.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

SEP 2010

Stephan Harris, Clerk
Casper

Attorneys For Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

DIAMOND STATE INSURANCE COMPANY, )
　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff, 　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　Case No. _____
vs. 　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
JO GATHERCOLE, 　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant. 　　　　　　　　)

## COMPLAINT FOR DECLARATORY JUDGMENT

**COMES NOW** the plaintiff, Diamond State Insurance Company ("Diamond State"), by and through its undersigned counsel, and hereby files its Complaint For Declaratory Judgment pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201. In support of its Complaint For Declaratory Judgment Diamond State states and alleges as follows:

Receipt # Cas650
Summons: ____ issued
　　　　　＿X＿ not issued

1.     Diamond State is an insurance company domiciled in the state of Indiana, with its principal place of business located in Pennsylvania. It is licensed to do business in Wyoming.

2.     Diamond State issued a Real Estate Errors and Omissions Insurance Policy, Policy No. REO 1009059, to Network Real Estate, LLC d/b/a Windermere Real Estate/Jackson Hole (hereafter referred to as the "policy"). A true and correct copy of the Real Estate Errors and Omissions Insurance Policy is attached hereto and marked as Exhibit 1.

3.     Windermere Real Estate/Jackson Hole is a named defendant in Civil Action No. 15261 entitled *Martha Anderson and Ernest Anderson v. Jo Gathercole, Robert Gathercole, and Network Real Estate, LLC, a Wyoming corporation, d/b/a Windermere Real Estate/Jackson Hole*, in the District Court, Ninth Judicial District, State of Wyoming (hereafter referred to as the "state action"). A true and correct copy of the Complaint in the state actionis attached hereto and marked as Exhibit 2.

4.     Jo Gathercole is a resident of Teton County, Wyoming and has provided professional services on behalf of Windermere Real Estate/Jackson Hole.   She is also named as a defendant in the Complaint.

2

5.     The Complaint asserts various claims against Jo Gathercole in her capacity as a licensed real estate salesperson and as a property owner adjoining the Andersons. It appears from the Complaint that Martha Anderson and Ernest Anderson (hereafter referred to as the "Andersons") assert claims against Jo Gathercole for fraud and fraudulent inducement (Exhibit 2, Count I), and negligent misrepresentation and professional malpractice (Exhibit 2, Count III). The remaining counts appear to assert claims against Jo Gathercole and her husband as the adjoining property owners that share a private road with the Andersons.

6.     The Andersons in their Complaint demand damages in the amount of no less than $2.5 millions from Robert and Jo Gathercole as husband and wife.     They also seek an injuction and declaratory judgment against the Gathercoles as husband and wife.     In addition, monetary damages in the amount of $2 million are sought from Jo Gathercole and Windermere Real Estate/Jackson Hole.

7.     Diamond State is currently providing a defense to Windermere Real Estate/Jackson Hole and Jo Gathercole for claims asserted in the Complaint. Diamond State has agreed to pay damages that Windermere Real Estate/Jackson Hole becomes legally obligated to pay because of claims made against Windermere Real Estate/Jackson Hole for wrongful acts arising out of the performance of

3

professional services for others pursuant to the terms, conditions and exclusions set forth in the policy.

8.     Pursuant to the Complaint, the Andersons demand money based upon claims not covered by the policy of insurance.  Coverage is limited to liability assessed against Windermere Real Estate/Jackson Hole for professional services rendered by Jo Gathercole, acting in her capacity as agent for Windermere Real Estate/Jackson Hole pursuant to the terms and conditions of the policy.

9.     The matter in controversy exceeds $75,000, and is between citizens of different states.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201.  The coverage form was issued in the state of Wyoming and, therefore, venue is proper.

## COUNT I – DECLARATORY JUDGMENT

10.    Plaintiff incorporates the prior allegations as if fully set forth herein.

11.    Under the insurance policy, Diamond State agreed to pay on behalf of Windermere Real Estate/Jackson Hole damages that Windermere Real Estate/Jackson Hole became legally obligated to pay because of claims made against Windermere Real Estate/Jackson Hole for wrongful acts arising out of the performance of professional services for others.  The policy provides that Diamond State has the

right and duty to defend Windermere Real Estate/Jackson Hole against any covered claim even if such claim is groundless, false or fraudulent. The policy states that Diamond State has "no duty to defend any claim not covered by this policy."

12. The policy contains various exclusions, including an exclusion for any claim arising out of any dishonest, fraudulent, criminal, or malicious act, error or omission committed by or at the direction of any insured. An insured is defined by the policy to be any of Windermere Real Estate/Jackson Hole, past or present, independent contractors and its employees providing professional services on behalf of Windermere Real Estate/Jackson Hole with the express consent of the named insured. The policy also excludes any damages for any claim arising out of the purchase, sale or leasing of property developed, constructed, or owned by an insured.

13. The policy does not cover damages that consist of punitive damages or exemplary damages, as well as payment for professional services, including the return of monies paid to Windermere Real Estate/Jackson Hole. The limits of liability are for each claim $1 million.

14. Based on the foregoing and based upon the clear language of the policy, Diamond State requests that this Court declare that there is no coverage under the policy for:

- Any claim for damages that do not arise out of the performance of professional services on behalf of Windermere Real Estate/Jackson Hole;

- Damages that are the result of fraud;

- Any punitive or exemplary damages;

- For claims against Jo Gathercole and her husband as owners of the adjoining property and as parties to the agreement to share with the Andersons attorneys' fees to oppose another neighbor's permit to build a structure on his property; and

- For any claim not covered under the policy of insurance

15.   Further, plaintiff seeks a declaration that any duty to provide a defense for any claims against Jo Gathercole shall cease in the event that Windermere Real Estate/Jackson Hole obtains summary judgment, directed verdict, or settlement of all claims against it or any of its agents, including Jo Gathercole.

16.   This action is necessary as Jo Gathercole objected to the request by plaintiff to intervene for the limited purpose of requesting that a jury via special interrogatories determine the cause of any damages that might be awarded in the state action.

**WHEREFORE,** plaintiff requests that judgment be entered in its favor declaring that there is no coverage under the policy as outlined above.

DATED this ___2ᵈ___ day of ___September___, 2010.

Judith Studer, Attorney No. 5-2174
SCHWARTZ, BON, WALKER & STUDER, LLC
141 South Center Street, Suite 500
Casper, WY  82601
Telephone (307) 235-6681

Attorneys For Plaintiff

# EXHIBIT 1



**united
national
group**

ADMINISTRATIVE OFFICES
THREE BALA PLAZA EAST, BALA CYNWYD, PA 19004
610-664-1500

**Insured's Copy**

Exhibit 1

**Diamond State Insurance Company®**
3 Bala Plaza, East, Suite 300
Bala Cynwyd, PA 19004



**united
national
group®**

**Administrative Offices:**
3 Bala Plaza, East, Suite 300
Bala Cynwyd, Pennsylvania 19004

### REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY DECLARATIONS
### THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.

| | | | |
|---|---|---|---|
| **SECTION I.** | **Named Insured and Mailing Address:** | **Policy No.:** | REO1009059 |

NETWORK REAL ESTATE, LLC
DBA: WINDERMERE REAL ESTATE/JACKSON HOLE/TETUM VALLEY
1325 S. HWY 89 #104

JACKSON, WY 83001

The Named Insured is:  Partnership

**SECTION II.**   **Policy Period: From**   06-15-2008 TO 06-15-2009
12:01 A.M. standard time at the address of the Named Insured as stated herein.

**SECTION III.**   **Premium:** $1,502.00

**SECTION IV.**   **Authorized Representative for Claim Notification:**
Diamond State Insurance Company®
Attn: Claims Department
3 Bala Plaza, East, Suite 300
Bala Cynwyd, PA 19004
Phone: (610)660-8877 or (800)333-0352

**SECTION V.**   **Retroactive Date:**  06-15-2004

**SECTION VI.**   **Limits of Liability:**   Each Claim   $1,000,000   Aggregate   $1,000,000

**SECTION VII.**   **Deductible Amount:**   Each Claim   $2500   X   **Damages and Claims Expenses**

**Damages Only**

**SECTION VIII.**   **Program Administrator**   Agent: AKA Insurance Group
Geo. F. Brown & Sons, Inc.           P.O. Box 17375
118 South Clinton Street             akagroup@hotmail.com
Suite 760                            Salt Lake City, UT 84117
Chicago, IL 60661                    **License Number (if Applicable):**

**SECTION IX.**   Forms and Endorsements attached at time of issuance:
JPA-100 (07/1998)         EPA-524 (10/2004)
DPA-128 (10/2004)         EAA-146
CPA-123 (10/2004)         EAA-147
EPA-508 (10/2004)         EAA-100 (3/2007)
EPA-509 (10/2004)         EPA-641 11 04 WY
EPA-520 (10/2004)

THIS POLICY IS NOT VALID UNTIL SIGNED BY OUR AUTHORIZED REPRESENTATIVE

By: _____

## REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

## THIS IS A CLAIMS MADE AND REPORTED POLICY. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE.

## THIS POLICY CONTAINS IMPORTANT EXCLUSIONS AND CONDITIONS TO YOUR COVERAGE. PLEASE REVIEW THE ENTIRE POLICY CAREFULLY AND DISCUSS ANY QUESTIONS YOU MAY HAVE WITH YOUR AGENT.

This policy does not become effective unless we issue a Declarations page to form a part hereof.

## WHAT TO DO IN CASE OF A CLAIM OR A POTENTIAL CLAIM

In the event you directly or indirectly become involved in any situation which you believe may result in a Real Estate Agents and Brokers Errors and Omissions **claim,** you should immediately report the details to your agent.

Note: Failure to make reports of **wrongful acts, claims,** suits, etc., may jeopardize your insurance.

# TABLE OF CONTENTS

**SECTION I. INSURING AGREEMENTS** ............................................................................. 3
    Coverage Provision ................................................................................................. 3
    Claims Made Provision ........................................................................................... 3
    Defense Provision .................................................................................................. 4
    Settlement Provision .............................................................................................. 4
    Territory ................................................................................................................. 4
    Supplemental Payments ......................................................................................... 4

**SECTION II. EXCLUSIONS** ....................................................................................... 5

**SECTION III.  WHO IS AN INSURED** ...................................................................... 9

**SECTION IV. DEFINITIONS** ...................................................................................... 9

**SECTION V. LIMITS OF LIABILITY AND DEDUCTIBLE** ........................................... 11
    Limit of Liability — Each Claim............................................................................... 12
    Limit of Liability — Aggregate ................................................................................ 12
    Deductible ............................................................................................................. 12

**SECTION VI. EXTENDED CLAIMS REPORTING PERIODS.** ..................................... 13

**SECTION VII. CONDITIONS** ..................................................................................... 14
    Insured's Duties in the Event of a Claim ................................................................ 14
    Reporting Possible Claims ..................................................................................... 15
    Action Against Us .................................................................................................. 16
    Subrogation ........................................................................................................... 16
    Policy Changes ...................................................................................................... 16
    Assignment of the Insured's Interest ...................................................................... 16
    Other Insurance .................................................................................................... 16
    Innocent Insured Protection ................................................................................... 16
    Bankruptcy ............................................................................................................ 17
    Premium ................................................................................................................ 17
    Examination and Audit of Books and Records ........................................................ 17
    Cancellation .......................................................................................................... 17
    Mergers, Acquisitions, Changes in Franchise Relationship and Other Material
    Changes ................................................................................................................ 17
    Application ............................................................................................................. 18
    Waiver of Terms..................................................................................................... 18

**THIS IS A CLAIMS MADE AND REPORTED POLICY. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

THROUGHOUT THIS POLICY, THE WORDS "YOU" AND "YOUR" REFER TO THE NAMED INSURED SHOWN IN THE DECLARATIONS. THE WORDS "WE," "US" AND "OUR" REFER TO THE COMPANY PROVIDING THIS INSURANCE. THE WORD "INSURED" MEANS ANY PERSON OR ORGANIZATION QUALIFYING AS SUCH UNDER SECTION III. "WHO IS AN INSURED." ALL WORDS AND PHRASES (OTHER THAN CAPTIONS) PRINTED IN **BOLDFACE** ARE DEFINED IN THE POLICY.

## REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

In consideration of payment of the premium and subject to the terms and conditions of this policy, we agree with you to provide insurance as stated in this policy.

## SECTION I. INSURING AGREEMENTS

### A. COVERAGE PROVISION

We will pay on your behalf, **damages** that you become legally obligated to pay because of **claims** made against you for **wrongful acts** arising out of the performance of **professional services** for others.

### B. CLAIMS MADE PROVISION

This insurance applies to a **wrongful act** only if all of the following conditions are satisfied:

1. the **wrongful act** took place on or after the **Retroactive Date;**

2. prior to the inception date of this **policy period** no Insured had knowledge of such **wrongful act** and had no basis to reasonably anticipate a **claim** that would be made. For purposes of this provision, prior knowledge of a **wrongful act** includes, but is not limited to, any prior **claim** or possible **claim** or circumstance referenced in your application;

3. the **claim** arising out of the **wrongful act** is first made against any Insured during the **policy period;** and

4. the **claim** is reported in writing to us no later than 60 days after the end of the **policy period** or, if applicable, during an extended **claims** reporting period subject to Section VI. A.

## C. DEFENSE PROVISION

We have the right and the duty to defend you against any covered **claim** even if such **claim** is groundless, false or fraudulent. We have the exclusive right to appoint counsel to defend you.

**Claim expenses** will be paid by us, and will be in addition to the limit of liability. Our right and duty to defend or continue to defend any claim ends when the applicable limit of liability has been exhausted by payment of **damages.** Once the limit of liability is depleted, we will tender control of the defense of any **claim** to you. You agree to accept such tender as a condition of this policy.

We have no duty to defend any **claim** not covered by this policy.

## D. SETTLEMENT PROVISION

We may investigate and solicit settlement offers for any **claim.** No offer to settle a **claim** will be accepted without your written consent.

If we recommend that you accept the judgment of the trial court, appellate court, any negotiated settlement or settlement offer, and you are not willing to accept such judgment or settlement, our liability for such **claim** will not exceed the amount we would have paid for **damages** incurred up to the time we made the recommendation, provided such amount does not exceed the remainder of the applicable limit of liability. Thereafter, we will be relieved of any additional liability under this Coverage Part, including the duty to defend.

If you are unwilling to appeal a judgment of a trial court, we have the right to appeal such judgment and we will bear all **claim expenses** subsequently incurred that result directly from the appeal. An increase in the judgment amount in such instance will be borne by us and will not be applied against the policy limits of liability.

## E. TERRITORY

The insurance provided by this policy applies to **wrongful acts** that result in **damages** anywhere in the world, provided that a **claim** is brought against you within the United States of America, its territories or possessions or Canada.

## F. SUPPLEMENTAL PAYMENTS

These supplemental payments will be paid in addition to the applicable limit of liability. The deductible amount is not applicable to the payments described below.

1. We will pay up to $250 for loss of earnings to each individual Insured for each day or part of a day of such Insured's attendance at our written request at a trial, hearing, arbitration or mediation proceeding involving a civil suit against such

Insured for covered **damages,** but regardless of the number of **insureds**, the total amount so payable for any one or series of trial, hearing or arbitration proceedings arising out of the same **wrongful act** in no event will exceed $5,000.

2. We will pay up to $2,500 per **policy period** per Insured, but in no event more than $10,000 for all Insureds during any **policy period,** for attorney fees, and other costs, expenses or fees resulting from the investigation or defense of a proceeding before a state licensing board, local real estate board or governmental regulatory body, arising out of any **wrongful act** in the rendering of or failure to render **professional services** covered under this policy. However:

   a. we have the right to approve legal counsel;

   b. you must provide us with written notice of such action during the **policy period** in which the investigation is begun and not later than 30 days after you have been notified by the entity initiating the investigation. If you fail to give us such written notice, we are not required to defend you;

   c. we are not obligated to pay defense costs for any subsequent appeals.

   Proceedings involving commission or fee disputes are excluded from this provision.

3. We will pay **pre-judgment interest** awarded against you on that part of the judgment, award, verdict or settlement we pay.  If we make a settlement offer to pay the available limit of liability, we will not pay the interest that accumulates after the date of the offer.

## SECTION II. EXCLUSIONS

This policy does not apply to:

**A.** any **claim** arising out of any dishonest, fraudulent, criminal, or malicious act, error or omission  committed  by or at the direction of any Insured. We will provide you with a defense of such **claim** unless or until the fraudulent, criminal or malicious act, error or omission has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not.  Criminal proceedings are not covered under this policy under any circumstance.

**B.** any **claim** made or brought by an Insured against any other Insured, unless such **claim** arises solely out of **professional services** performed for that party in a broker-client capacity;

**C.** any **claim** arising out of any actual or alleged:

1. interviewing, hiring or refusal to hire;

2. employment;

3. termination of employment; or

4. employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination, of an applicant or a present or former employee of yours;

**D.** any **claim** arising out of any actual or alleged unlawful discrimination of any kind by any Insured, based on, but not limited to, race, color, creed, national origin, physical or other disability, marital status, age, sex or sexual orientation;

**E.** any **claim** arising out of any Insured's involvement in, or **professional services** performed for, any entity not named as an Insured that is wholly or partially owned at the time **professional services** are performed by an Insured, or in which an Insured is an officer, partner or employee or which is to any extent controlled, operated or managed by an Insured;

**F.** any **claim** made by any entity that wholly or partially controls, manages, operates or holds ownership in any Insured at the time **professional services** are performed;

**G.** any obligation under any employer's liability law, unemployment compensation law, workers' compensation law, disability benefits law or similar laws;

**H.** liability of others assumed by you under any contract or agreement. This exclusion does not apply to liability for **damages** that you would have in the absence of such contract or agreement;

**I.** any **claim** arising out of:

1. **bodily injury**; or

2. physical injury directly caused by you to tangible property, including all resulting loss of use of that property.

Subparagraph I. 2. above does not apply to **claims** arising out of your distribution, maintenance, operation or use of a lockbox on property not owned by you.

**J.** any **claim** arising out of the purchase, sale or leasing of property developed, constructed or owned by:

1. an Insured; or

2. any entity identified in exclusion E or F.

This exclusion does not apply to **claims** arising out of:

a. the sale of **residential property** (including the primary residence) in which one or more Insured's and/or the Insured's domestic partner has ownership interest provided all of the following conditions are satisfied:

   (1) A seller disclosure form, signed by the seller, is provided to the buyer and acknowledged by the buyer prior to closing, except in circumstances where the disclosure form is not applicable, such as the sale of estate and/or trust properties;

   (2) A home warranty was purchased prior to or at closing;

   (3) A property inspection was completed on the property; and

   (4) A state or local board approved standard sales contract or a sales contract drafted by a licensed attorney was used.

   This coverage does not apply to **claims** made by the original owner of the property alleging inducement by you to the financial detriment of the original owner;

b. the sale or leasing of real property in which one or more Insureds' ownership interest is less than 25% at the time **professional services** were performed; or

c. the sale of real property owned by you if all the following conditions are met:

   (1) The property was acquired by you under a written **Guaranteed Sale Listing Contract;** and

   (2) The title is held by you for twelve months or less; and

   (3) The property was listed for sale continuously by you from the date of acquisition to the date of resale;

**K.** any **claim** arising out of the actual or alleged violation of:

1. the Employee Retirement Income Security Act of 1974;

2. the Securities Act of 1933;

3. the Securities Act of 1934;

4. any state Blue Sky or securities law;

or any rules, orders, regulations or amendments issued in relation to the above Acts;

**L.** any **claim** arising out of services performed by you in the capacity of a certified public accountant, actuary, architect or engineer, attorney, construction advisor/manager, escrow agent, financial management consultant, mortgage banker, insurance agent or insurance broker, mortgage broker, business broker, property developer or title insurance agent;

**M.** any **claim** arising out of **property syndication** or **real estate investment trusts;**

**N.** any **claim** arising out of the failure to effect, maintain or to advise of the need to effect or maintain, adequate insurance, suretyship or bonds;

**O.** any **claim** arising out of:

1. the failure or inability to pay or collect insurance premiums, escrow, rental, lease or tax funds, or any money held for others;

2. failure to pay commissions, including finder's fees; or

3. the conversion, misappropriation, commingling or defalcation of funds or other property;

notwithstanding the foregoing, in the event a **claim** is made against you seeking both the return of escrow or earnest money and alleging a **wrongful act** in the performance of **professional services** covered under this policy, we will defend such **claim** as provided under the terms and conditions of this policy without any obligation to reimburse you for the payment of, or pay monies held as, earnest money or escrow;

**P.** 1. any **claim** arising out of:

a. the actual, alleged or threatened discharge, dispersal, release, seepage, migration, or escape of **pollutants**;

b. the failure to detect, report, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, assess the effects of or advise of the existence of **pollutants**; or

c. any governmental or regulatory notification that any Insured is a potentially responsible party for liability arising out of **pollutants**;

2. any loss, cost or expense arising out of any:

a. request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

b. **claim** or suit by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

**Q.** any **claim** arising out of nuclear projects, nuclear reaction, radiation or radioactive contamination or any consequence thereof, regardless of cause.

## SECTION III. WHO IS AN INSURED

**A.** The **Named Insured** is an Insured.

**B.** Each of the following is also an Insured:

1. Any past or present officer, director, partner, stockholder, member, manager or employee for **professional services** performed within the scope of his or her duties on your behalf.

2. Any of your past or present independent contractors and their employees providing **professional services** on your behalf with your express consent.

3. The heirs, executors, administrators and legal representatives of an Insured as defined in A., B.1. or B.2. above, in the event of an Insured's death, incapacity or bankruptcy, but only for liability arising out of **professional services** performed by or on your behalf prior to such Insured's death, incapacity or bankruptcy.

## SECTION IV. DEFINITIONS

**A. Bodily injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily injury** does not include emotional distress arising out of **personal injury.**

**B. Claim** means a demand for money or services including, but not limited to, the service of a lawsuit or the institution of arbitration proceedings or other alternative dispute resolution proceedings, alleging a **wrongful act** arising out of the performance of **professional services.**

**C. Claim expenses** means:

1. all fees, costs and expenses incurred by us or by you with our consent, resulting from the investigation, discovery, adjustment, defense, arbitration, settlement or appeal of a **claim;**

2. premiums for bonds required as a result of a covered **claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable limit of liability. However, we have no obligation to apply for or furnish any such bonds;

3. all costs taxed against you in any suit defended by us; and

4. all interest on the entire amount of any judgment which accrues after the entry of judgment and before we have paid or tendered or deposited in the Court that part of the judgment that does not exceed the policy limit.

**D. Damages** means any amount that you are legally obligated to pay for any covered **claim**, including judgments, awards or settlements entered into with our prior knowledge and consent. But **damages** does not include:

1. sanctions, fines, forfeitures or penalties that are imposed or ordered by an administrative or governmental agency, local board and/or state licensing authority;

2. punitive damages, exemplary damages or treble damages, unless coverage for such **damages** is required under the applicable state law; or

3. payment for **professional services**, including the return, withdrawal or reduction of monies paid to you.

**E. Guaranteed Sale Listing Contract** means an agreement between you and the seller of a property, in which you agree to purchase the property if it is not sold under the listing agreement by the time specified in the agreement.

**F. Named Insured** means the entity or individual named in the Declarations.

**G. Personal injury** means injury, other than **bodily injury** arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord, or lessor;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

**H. Policy period** means the period of time specified in the Declarations.

**I. Pollutants** means any solid, liquid, gaseous, thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead, radon, asbestos, silica and waste. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants** does not mean heat, smoke, vapor, soot or fumes from a hostile fire. Hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**J. Pre-judgment interest** means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment, whether or not made part of the settlement, verdict, award or judgment.

**K. Professional services** means services performed for others in your capacity as a real estate agent, real estate broker, real estate property manager or leasing agent, real estate consultant or counselor, real estate appraiser, real estate auctioneer, notary public, or member of a formal real estate accreditation, standard review or similar real estate board or committee.

**L. Property syndication** means the formation of, or engagement in, a general or limited partnership, joint venture, unincorporated association or similar organization for the purpose of investment or gain from an interest in real property, including but not limited to a sale, exchange, trade or development of such real property, on behalf of others.

**M. Real estate investment trusts** means any trust, corporation, association, or entity designed or used to permit investment in interests in real property, under which such interests are held and managed for the beneficial owners of the trust or other entity, whether or not it qualifies for treatment as a real estate investment trust pursuant to 26 U.S.C. 856, 857 or 858 or any other provision of the United States Internal Revenue Code.

**N. Residential property** means a 1 to 4 family dwelling in which you or others reside.

**O. Retroactive Date** is the date specified as such in the Declarations and other dates, if any, that are specified as such for you by endorsement to this policy.

**P. Wrongful Act** means any actual or alleged negligent act, error or omission, or **personal injury**.

## SECTION V. LIMITS OF LIABILITY AND DEDUCTIBLE

**A. Limits of Liability**

1. The applicable limit of liability shown in the Declarations is the maximum we will pay regardless of the number of:

   a. Insureds;

   b. individuals or entities that make a **claim,** or

   c. **claims** made.

2. Limit of Liability – Aggregate

   Our liability for all **claims** will not exceed the amount stated in the Declarations as "Limit of Liability – Aggregate". This limit is the maximum amount of **damages** that we will pay for all **claims** made or deemed made during the **policy period** and, if applicable, during an Extended Claims Reporting Period.

3. Limit of Liability – Each **Claim**

   a. Subject to the "Limit of Liability Aggregate" above, the "Limit of Liability – Each **Claim**" will apply in excess of the deductible shown in the Declarations. Our liability for each covered **claim** first made during the **policy period,** or if applicable, during an Extended **Claims** Reporting Period will not exceed the amount stated in the Declarations for "Limit of Liability – Each **Claim**." This limit is the maximum amount of **damages** that we will pay for each covered **claim**.

   b. Two or more covered **claims** arising out of a single **wrongful act**, or any series of related **wrongful acts**, will be considered a single **claim**. The single **claim** will be subject to the "Limit of Liability – Each **Claim**" in effect at the time such **claim** was first made against you. Only one deductible will apply to such single **claim**. If the first of such **claims** is made prior to the effective date of this policy, no coverage will apply to any subsequent **claims** made during this **policy period** based upon the same or related **wrongful acts**.

## B. Deductible

1. The "Each **Claim**" deductible stated in the Declarations applies to each **claim** and must be paid by you to us within 30 days of written demand and will be billed as incurred by us. The deductible will first be applied to all **claim expenses** and then any remainder will be applied to **damages**.

2. The "Each **Claim**" deductible stated in the Declarations will be reduced by 50 percent, but not to exceed a maximum reduction of $10,000 for each **claim**, for any **claim:**

   a. provided all of the following conditions are satisfied:

(1) A seller disclosure form, signed by the seller, is provided to the buyer and acknowledged by the buyer prior to closing, except in circumstances where the disclosure form is not applicable, such as the sale of estate and/or trust properties; and

(2) A home warranty was purchased prior to or at closing for new homes, the warranty provided by the builder is acceptable; and

(3) A property inspection was performed on the property or a statement outlining the reasons a property inspection should be completed and a list of at least three property inspection companies or property inspection company directory is provided to the buyer prior to the closing; and

(4) A state or local board approved standard sales contract or a sales contract drafted by a licensed attorney was used; or

b. If a **claim** is resolved or concluded with you and our consent and knowledge within 1 year following the date that the **claim** is reported in writing to us.

If both 2.a. and b. above apply, only one reduction applies.

## SECTION VI. EXTENDED CLAIMS REPORTING PERIODS

### A. Automatic Extended Claims Reporting Period

In case of cancellation or non-renewal of this policy by you or us, for any reason other than non-payment of premium or failure to comply with the terms or conditions of this policy, an automatic 60 day Extended **Claims** Reporting Period option, effective at the termination of the **policy period**, will be provided by us at no additional cost unless this insurance is replaced with the same or similar insurance issued by us or any other company, whether or not the limits or deductibles are identical to those provided under this policy. This Extended **Claims** Reporting Period will extend the time in which you can give written notice to us of **claims** first made against you during this Extended **Claim** Reporting Period for any **wrongful act** in the rendering or failure to render **professional services** on or after the **Retroactive Date** prior to the termination of the **policy period**, subject to its terms, limitations, exclusions and conditions.

### B. Optional Extended Claims Reporting Period

1. If this policy is canceled or non-renewed, you may purchase an Extended **Claims** Reporting Period Endorsement. This endorsement to the policy, when issued, extends the period of time during which you may report **claims** to us. This endorsement applies only to **claims** first made against you and reported to us during this Optional Extended **Claims** Reporting Period and arising out of

**professional services** provided on or after the **Retroactive Date** and prior to the end of the **policy period**.

2. The following conditions must be met before this option may be exercised:

   a. this policy was canceled or non-renewed for reasons other than failure to comply with policy provisions, failure to cooperate with us or material misrepresentation of facts; and

   b. if you are sole proprietor, when you request to purchase this option your license or right to practice is not revoked, suspended or surrendered by or at the request of any regulatory authority; and

   c. we must receive written notice of your intent to purchase the option no later than 60 days after the end of the **policy period.** The Extended **Claims** Reporting Period will not go into effect unless the total additional premium is paid when due.

3. The term of this Extended **Claims** Reporting Period will be either 1 or 3 years. The premium charged for this endorsement will be in accordance with the rules, rates and rating plans we have in effect at the inception of the expiring **policy period**.

## C. Unlimited Extended Claims Reporting Period — Retirement

If you cancel or non-renew this policy due to either:

1. your retirement, if you are designated in SECTION I. of the Declarations as an independent contractor or a sole proprietor; or

2. the retirement of 1 or more of your partners or principals, if you are designated in SECTION I. of the Declarations as a partnership or corporation;

then the term of the reporting period for the Extended **Claims** Reporting Period will be unlimited.

**D.** The entire premium for the Optional or Unlimited Extended **Claims** Reporting Period Endorsement will be deemed fully earned when paid.

**E.** The Extended **Claims** Reporting Periods do not otherwise change policy provisions.

## SECTION VII. CONDITIONS

## A. Insured's Duties in the Event of a Claim

In the event of a **claim,** you must do the following:

1. You must give prompt written notice to us, but in no event later than 60 days after the end of the **policy period** or, during an Extended **Claims** Reporting Period, if applicable, subject to Section VI. Such written notice will include every demand, notice, summons or any other applicable information received by you or your representative.

2. You must not make any payment, admit any liability, settle any **claim** or assume any obligation without prior consent from us.

3. If you have the right to either accept or reject the arbitration of any **claim,** you will exercise such right only with our written consent.

4. You must cooperate with, and provide all relevant information to us with respect to any **claim.** We may require that you submit to examination or questioning, or attend hearings, depositions and trials. In the course of investigation or defense, we may require written statements or your attendance at meetings with us. You must assist us in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses, all without charge to us.

5. You must do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that may be available to you.

## B. Reporting Possible Claims

If during the **policy period** or any applicable Extended **Claims** Reporting Period, you first become aware of a possible **claim** arising from a specific **wrongful act** in performing **professional services** for which coverage may be provided, such potential **claim** must be reported to us as soon as practicable during the **policy period** but no later than 60 days after the end of the **policy period**, or if applicable, during any Extended **Claims** Reporting Period, subject to Section VI. The notice of the potential **claim** must include the following:

1. the potential claimant's name and address;

2. a description of the **professional services** provided or that are alleged should have been provided;

3. an explanation as to why you believe the **claim** may be made and the date that you first became aware of such possible **claim**; and

4. an explanation of the type of **claim** that is anticipated.

Any **claim** that may subsequently be made against you arising out of that **wrongful act** will be deemed for the purposes of this insurance to have been made on the date we received such notice.

## C. Action Against Us

No Insured or anyone else may bring any legal action against us concerning this policy until:

1. there has been full compliance with all terms and conditions of this policy; and

2. the amount of **damages** has been determined by:

   a. final judgment against you after trial, if the time to appeal such judgment has expired without an appeal being taken, or if an appeal is taken, after the appeal has been determined; or

   b. the settlement of the **claim** according to the terms and conditions of this policy.

   No person or organization will have any right under this policy to join us as a party to any action against you to determine your liability.

## D. Subrogation

If you have rights to recover all or part of any payment for **damages** or **claim expenses** we made under this policy, those rights are transferred to us to the extent we have made payment on your behalf. You must do whatever is necessary to secure such rights and do nothing to impair them. Any amount recovered will first be applied to reduce our loss, or if applicable, as directed by law.

## E. Policy Changes

The terms and conditions of this policy cannot be waived or amended except by specific written endorsement issued by us and made a part of this policy.

## F. Assignment of the Insured's Interest

Your interests under this policy may not be assigned to any other person or organization without our written consent.

## G. Other Insurance

This insurance will be excess over any other insurance that also provides coverage for any **claim,** including any deductible provisions. However, any insurance specifically arranged by you to apply in excess of this insurance will not be deemed other insurance.

## H. Innocent Insured Protection

If coverage under this policy would not apply because of Section II, Exclusion A, we will cover any Insured who did not commit, participate in, acquiesce in or fail to take appropriate action after having personal knowledge of such dishonest, fraudulent, criminal or malicious act, error or omission.

## I. Bankruptcy

Bankruptcy or insolvency of any Insured or any Insured's estate will not relieve us of our obligation under this policy.

## J. Premium

You are responsible for the payment of all premiums and will be the payee for any return premium. The premium may be adjusted at any time during the **policy period** if there are changes in your operations, or changes in the provisions of the policy.

## K. Examination and Audit of Books and Records

We may, but are under no obligation to, examine and audit your books and records as they relate to this policy at any time during the **policy period** and up to 3 years after the final termination of this specific policy.

## L. Cancellation

You may cancel this policy by returning the policy to us or by mailing written notice to us stating when thereafter, such cancellation will be effective. If you cancel, the refund will be 90% of the unearned premium.

We may cancel this policy by sending written notice to you, at the address last known to us. We will provide written notice at least 30 days before the cancellation is to be effective. However, you will only be entitled to 10 days notice if we cancel because the premium has not been paid when due. If we cancel, earned premium will be computed on a pro rata basis.

The mailing of any notice of cancellation will be sufficient proof of notice. Upon cancellation of this policy, the end of the **policy period** will be changed to the effective date of cancellation. Unearned premium will be returned by us as soon as practicable, but return of unearned premium is not a condition of cancellation.

## M. Mergers, Acquisitions, Changes in Franchise Relationship and Other Material Changes

In the event of any merger, acquisition or change in a franchise relationship involving you, or any other material change in your operations, you must notify us prior to the date of the change. There will be no coverage under this policy for any merger, acquisition or material change unless and until the change has been accepted in writing by us and we have determined the appropriate premium. Premium will be calculated in accordance with our rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

## N. Application

The statements in the Application are your representations and are material to the underwriting and acceptance of coverage by us. This policy is issued in reliance on the accuracy of such representations.

## O. Waiver of Terms

In the event we do not insist on strict compliance with any of the terms, provisions or conditions of coverage under this policy, or if we do not exercise our rights or privileges thereto, our actions will neither operate or be construed, as a waiver of our right to enforce any term, provision or condition of coverage.

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on** 06-15-2008 **at 12:01 A.M. standard time, forms a part of**

**Policy No.:** REO1009059

**Issued To:** NETWORK REAL ESTATE, LLC

**By:**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### FAIR HOUSING ENDORSEMENT –
### DAMAGES AND CLAIMS EXPENSES ENDORSEMENT

This endorsement modifies insurance provided under the following:

REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

I.  We will pay on your behalf, **damages** and **claims expenses** that you are legally obligated to pay because of **claims** alleging violations of Title VIII of the Civil Rights Act of 1968 or the Fair Housing Amendment Act of 1988 or any similar state or local law or ordinance.  Our obligation to pay such **damages** or **claims expenses** will not exceed the limit indicated in the Schedule below, as a result of any one **claim** or such **claims** during the **policy period**.  These limits are part of, not in addition to, the Each **Claim** and Aggregate limits.

    A. Fair Housing **Damages** and **Claims** Expenses Limit of Liability:

        [  ]   $100,000

        [  ]   $250,000

        [  ]   $500,000

        [ X ]   $1,000,000

        [  ]   $

    B. Additional Premium:

II. With respect to coverage provided by this endorsement, Exclusion D. of Section II. is deleted.

                            _____ _____ _____
                               Authorized Representative

## In Witness Clause

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Secretary

President

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on** **at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### WYOMING CANCELLATION AND NONRENEWAL PROVISIONS

This endorsement modifies insurance provided under the following:

REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

Paragraph L. Cancellation of VII. CONDITIONS is deleted and replaced by the following:

  L.  Cancellation and Nonrenewal

  1. The first **Named Insured** shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

  2. Cancellation Of Policies In Effect

  a. Less Than 60 Days

  If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first **Named Insured** written notice of cancellation at least:

  (1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium;

  (2) 30 days before the effective date of cancellation if we cancel for any other reason.

  b. 60 Days Or More

  If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

  (1) Nonpayment of premium.

(2)  Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy.

(3)  Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the policy.

(4)  Substantial breaches of contractual duties, conditions or warranties.

If we cancel, we will mail or deliver to the first **Named Insured** and the agent, if any, written notice of cancellation, stating the reason for cancellation, at least:

(a)  10 days before the effective date of cancellation if cancellation is for the reason stated in b.(1) above; or

(b)  45 days before the effective date of cancellation if cancellation is for the reasons stated in b.(3) or (4) above.

3.  We will mail or deliver our notice to the first **Named Insured's** last mailing address known to us.

4.  Notice of cancellation will state the effective date of cancellation.  The **policy period** will end on that date.

5.  If this policy is cancelled, we will send first **Named Insured** any premium refund due.  If we cancel, the refund will be pro rata.  If the first **Named Insured** cancels, the refund may be less than pro rata.  The cancellation will be effective even if we have not made or offered a refund.

6.  If notice is mailed, proof of mailing will be sufficient proof of notice.

7.  If we cancel this policy in accordance with Paragraph 1. above, any unearned premium will be refunded to the first **Named Insured** prior to the effective date of cancellation.

8.  If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first **Named Insured** and the agent, if any, at least 45 days before:

a.  The expiration date; or

b.  The anniversary date if this is a continuous policy.

9.  Notice of nonrenewal will state the reason for nonrenewal.

10. Any notice of nonreneal will be mailed or delivered to the first **Named Insured's**  and agent's last mailing address known to us.  If notice is mailed, proof of mailing will be sufficient proof of notice.

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on          at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ENVIRONMENTAL HAZARDS AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

Exclusion P. of SECTION II is deleted and replaced by the following:

P. Any **claim** arising out of:

1. The actual, alleged or threatened discharge, dispersal, release, seepage, migration or escape of **pollutants**;

2. The failure to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to and/or assess the effects of **pollutants**; or

3. Any governmental or regulatory notification that any insured is a potentially responsible party for liability arising out of **pollutants**;

   any loss, cost or expense arising out of any:

   a. request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

   b. **claim** or suit by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

This endorsement does not apply to any **claim** arising out of the purchase, sale, leasing or property management of property, other than residential property, developed, constructed or owned by you or any entity identified in Exclusion E. or F. of the policy to which this endorsement is attached.

Additional Premium:

_____
Authorized Representative

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on       at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### FORMAL MEDIATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

I. Paragraph B. Deductible of SECTION V is deleted and replaced by the following:

   B. Deductible

      1. The Each **Claim** deductible stated in the Declarations applies to each **claim** and must be paid by you to us within 30 days of written demand and will be billed as incurred by us.  The deductible will be first applied to all **claims expenses** and then any remainder will be applied to **damages**.

      2. The Each **Claim** deductible stated in the Declarations will be reduced by 50 percent, but not to exceed a maximum reduction of $10,000 for each **claim**, for any **claim**:

         a. provided all of the following conditions are satisfied:

            (1) A seller disclosure form, signed by the seller, is provided to the buyer and acknowledged by the buyer prior to closing except in circumstances where the disclosure form is not applicable, such as the sale of estate and/or trust properties;

            (2) A home warranty was purchased prior to or at closing; for new homes, the warranty provided by the builder is acceptable; and

            (3) A property inspection was performed on the property or a statement outlining the reasons a property inspection should be completed and a list of at least three property inspection companies or a property inspection company directory was provided to the buyer/seller prior to closing; and

(4) A state or local board approved standard sales contract or a sales contract drafted by a licensed attorney was used; or

b. If a **claim** is resolved or concluded with your and our consent and knowledge within one year following the date of the **claim** is reported in writing to us.

3. In the event that a **claim** covered by this policy is fully and finally resolved during the process of voluntary **formal mediation** the "Each **Claim**" deductible shown in the Declarations will be reduced by 50 percent. The maximum amount of this waiver will not exceed $10,000 per **claim**.

4. This endorsement applies only if the **formal mediation** is invoked solely at your option. If either arbitration or mediation is required by either state or local authority, or via sale contract, this endorsement does not apply.

II. For the purpose of this endorsement **formal mediation** means the non-binding process by which a qualified mediator, chosen by the parties involved in the **claim** with our agreement, meets and intercedes with the parties in order to a reach a resolution. In order to be considered **formal mediation**, the process must be of a kind set forth in the Commercial Mediation Rules of the American Arbitration Association. We may, at our sole option, recognize any mediation process presented for approval. Arbitration is consideration to be part of the process of **formal mediation**. Litigation is not considered to be part of the process of **formal mediation**.

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on      at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### FUNGI (INCLUDING MOLD) EXCLUSION

This endorsement modifies insurance provided under the following:

REAL ESTATE ERRORS AND OMISSIONS INSURANCE POLICY

I. This policy does not apply to any **claim** based on or arising out of, whether sudden or over a long period of time:

    A. the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, growth or presence of; or

    B. the actual, alleged failure to detect, report, test for, monitor, clean-up, remove, contain, dispose of, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, or advise of the existence of, any **fungi** or **microbes** or of any spores, mycotoxins, odors, or any other substances, **organic pathogens**, products or byproducts produced by, released by, or arising out of the current or past presence of **fungi** or **microbes**.

    C. any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the premises or the location of the rebuilding, repair or replacement, by **fungi** or **microbes**.

    D. any remediation of **fungi**, including the cost to:

        1. Remove the **fungi** from the covered property or to repair, restore or replace that property; or

        2. Tear out and replace any part of the building or other property as needed to gain access to the **fungi**.

    E. the cost of any testing or monitoring of air or property to confirm the type, absence, presence of level of **fungi** whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the **damages** claimed.

II.  For the purposes of this endorsement, the following definitions apply:

**"Fungi"** means any form of fungus including, but not limited to, yeast, mold, mildew, rust, smut or mushroom.

**"Microbes"** means any non-fungal microorganism or non-fungal colony-forming organism that causes infection or disease.

**"Organic Pathogen"** means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, their byproducts such as mycotoxins, mildew or biogenic aerosol.

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on       at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

   ALL PARTS OF THE POLICY

Notwithstanding any other provision of this policy to the contrary, this insurance does not apply to any loss, cost, expense, damage, injury or economic detriment, whether arising by contract, operation of law or otherwise whether or not concurrent or in any sequence with any other cause or event, that in any way, form or manner, directly or indirectly, arises out of, results from or is caused by "terrorism", and also including any action taken in hindering or defending against "terrorism".

"Terrorism" means any act of force or violence or other illegal means, whether actual, alleged or threatened, by any person, persons, group, private or governmental entity or entities, or any other type of organization of any nature whatsoever, whether the identity of which is known or unknown, that appears to be for political, religious, racial, ethnic, ideological, ecological or social purposes, objectives or motives and that causes or appears to be intended to cause:

1.   alarm, fright, fear of danger, concern or apprehension for public safety;

2.   the interference or disruption of an electronic, communication, information or mechanical system;

3.   the intimidation or coercion of the civilian population, or any governmental body; or

4.   the alteration of the policies, foreign or domestic of any governmental body,

This exclusion does not affect the applicability of, and is in addition to, any exclusion of war, warlike or military action, whether or not specifically denominated as such.

(The attaching clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

**This endorsement, effective on** **at 12:01 A.M. standard time, forms a part of**

**Policy No.:**

**Issued To:**

**By:**                                                                                    .

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## WAR EXCLUSION

This endorsement modifies insurance provided under the following:

ALL LIABILITY COVERAGES OF THE POLICY

Any exclusion for war, warlike or military action whether or not specifically denominated as such, is deleted and replaced by the following:

Notwithstanding any provision of this policy to the contrary, this insurance does not apply to any injury, damage, loss, cost or expense, due to war, whether or not declared, or any act or condition incident to war.  War includes civil war, insurrection, rebellion, revolution or action taken by governmental authority or hindering or defending against any of these.

This exclusion does not affect the applicability of, and is in addition to, any exclusion of terrorism, whether or not specifically denominated as such.

# EXHIBIT 2

## IN THE DISTRICT COURT OF TETON COUNTY, WYOMING
### NINTH JUDICIAL DISTRICT

Martha Anderson and Ernest Anderson )
                                              )

              Plaintiffs,               )

                                                )

                  v.                     ) Civil Action No. _15-2-6_

                                                )

Jo Gathercole, Robert Gathercole, and )
Network Real Estate, LLC, a )
Wyoming corporation, d/b/a )
Windermere Real Estate/Jackson Hole ) **TRIAL BY JURY**
                                               ) **DEMANDED**

                 Defendants.             )

## COMPLAINT AND ACTION FOR DECLARATORY JUDGMENT, AWARD OF MONETARY DAMAGES AND MANDATORY INJUNCTION

       COMES NOW the Plaintiffs Martha Anderson and Ernest Anderson ("Plaintiffs"), by and through their attorney Mark D. Sullivan, and hereby file this Complaint and Action for Declaratory Judgment pursuant to Wyoming Statutes § 1-37-103. Plaintiffs seek an award of damages, a mandatory injunction and a declaratory judgement quieting title. Plaintiffs seek monetary damages for the Defendants Robert and Jo Gathercole's multiple acts of fraud, intentional misrepresentation, breach of contract, intentional infliction of emotional distress and breach of the implied covenant of good faith and fair dealing. Plaintiffs also seek damages for the negligent and fraudulent misrepresentations of the Defendants Jo Gathercole and Network Real Estate, LLC d/b/a Windermere Real Estate/Jackson Hole, stemming from the professional services rendered by Jo Gathercole and Windermere in connection with the sale of real estate to the Plaintiffs. Plaintiffs furthermore seek a Declaratory Judgment that: (1) the Plaintiffs have the right to the continued use of the driveway to their home in its current location by either adverse possession, easement by prescription or irrevocable license; and (2) that the Defendants Jo and Robert Gathercole may not place any obstructions or structures within the 60-foot wide right-of-way easement shared by the parties and by which the Plaintiffs and other property owners and renters access their homes and properties in the Country Estates Subdivision.

       Furthermore, Plaintiffs seek a permanent and mandatory injunction directing the Defendants to remove any and all structures and obstructions from the shared private road

**Anderson v. Gathercole et al., Complaint**

1

Exhibit 2

easement, including the fence posts and fence remnants, light pole and security camera, any and all vehicles including their camper, horse trailer, equipment trailer, boat and plow truck, the garden and structures enclosing it, and any other obstructions of any kind. Finally, the Plaintiffs seek a permanent and mandatory injunction directing the Defendants to cease and desist from their acts of intimidation and aggression toward the Plaintiffs.

**Parties**

1. Plaintiffs Martha and Ernest Anderson are a married couple and residents of Teton County Wyoming. Plaintiffs' home is located at 3900 West Northfork Fall Creek Road, Wilson, Wyoming, in the area known as Red Top Meadows.

2. The Defendants Robert Gathercole and Jo Gathercole are residents of Teton County Wyoming and neighbors of the Plaintiffs. Jo Gathercole is furthermore believed to be a licensed real estate salesperson and was the real estate agent that listed and sold the Plaintiffs their home and property while working for the Defendant Network Real Estate d/b/a Windermere Real Estate/Jackson Hole.

3. Network Real Estate doing business under the trade name Windermere Real Estate/Jackson Hole (hereinafter "Windermere"), is a Wyoming Corporation engaged in the business of marketing and selling real estate. Windermere maintains an office in Teton County located at 1325 S. Highway 89, Jackson Wyoming.

**Jurisdiction and Venue**

4. This Court has jurisdiction over the subject matter of this action pursuant to Article 5, Section 10 of the Wyoming Constitution and Wyoming Statutes § 1-37-103.

5. This Court has personal jurisdiction over the Defendants Jo Gathercole and Robert Gathercole because they are residents of Teton County, Wyoming and work primarily in Teton County.

6. This Court has personal jurisdiction over the Defendant Windermere because it does substantial business in Teton County, Wyoming, and maintains an office in Teton County, Wyoming.

7. Venue is proper in this Court because all parties reside in Teton County or do business in Teton County.

**Anderson v. Gathercole et al., Complaint**

8.     Venue is also proper in this Court because the real property at issue is located in Teton County.

**Facts Relevant to All Claims**

**A. The Plaintiffs Purchase Their Home Under False Pretenses**

9.     In the summer of 2005, the Plaintiffs were in the market for a new home, and actively looking for a suitable property.

10.    While out looking at properties without a real estate agent, the Plaintiffs came upon the property they would subsequently come to purchase located at 3900 West North Fork Fall Creek Road, Wilson, Wyoming, also known as Lot 4B of the Country Estates Subdivision (hereinafter the "Anderson Property"). The Anderson Property is located in the area known as Red Top Meadows.

11.    Upon approaching the Anderson Property, before the Plaintiffs had even gotten out of their car, they were immediately met by the Defendant Jo Gathercole, who lived next door, at 3850 North Fork Fall Creek Road (also known as Lot 3 of the Country Estates Subdivision), and was the sellers' listing agent for the Anderson Property.

12.    Jo Gathercole explained that she was the sellers' agent for the Anderson Property, and showed it to the Plaintiffs. During this initial showing, Jo Gathercole indicated that the neighbor who owned the two lots to the west, lots 4A and 5 of the Country Estates Subdivision, Robert Baltensperger, intended to build a large horse barn on Lot 5, a lot that is physically separated from the Plaintiffs Property. However, Jo Gathercole represented that no further building could be done in the open meadow on lot 4A, immediately adjacent to the Anderson Property.

13.    Jo Gathercole furthermore explained that there were no Covenents, Conditions and Restrictions governing or restricting the Anderson Property, and that the Plaintiffs, if they so desired, could enlarge the home on the property after they purchased it.

14.    The Plaintiffs were interested in the home. So, after this initial showing, the Plaintiffs sought out another real estate agent, Peter Selkowitz, to review the possibility of purchasing the home and to present offers on behalf of the Plaintiffs. Mr. Selkowitz, then and now, works for Sotheby's International Realty in Jackson.

**Anderson v. Gathercole et al., Complaint**

15.    From that point forward, Mr. Selkowitz, acting as an intermediary, was the Plaintiffs' principal point of contact for the transaction, and worked with Jo Gathercole in sharing information, presenting offers on the property and negotiating the purchase.

16.    After some preliminary negotiations, the Plaintiffs made an offer to purchase the property on July 18, 2005, which offer was accepted by the sellers that same date. A written contract was formed, with closing to take place on August 23, 2005.

17.    Following the signing of the contract, a title search revealed the existence of Covenants that restricted the development potential of the Anderson Property as well as the adjoining lot, Lot 4A.

18.    At the request of the Plaintiffs, who thought they might want to build a small addition to the house, an addendum to the contract was signed on July 17, 2005 by which the sellers agreed to secure a nullification of the Covenants before closing.

19.    On behalf of the seller, Jo Gathercole then began negotiating with the owners of Lot 4A, Robert and Gisela Baltensperger, to remove the Covenants.

20.    Jo Gathercole was the sole point of contact with the Baltenspergers.

21.    By hand-written note faxed on July 24, 2005, Jo Gathercole contacted Mr. Baltensperger and attempted to negotiate the removal of the Covenants.

22.    Mr. Baltensperger responded to Jo Gathercole's inquiry with a letter dated July 30, 2005, addressed to Windermere Real Estate, in which Mr. Baltensperger stated that he would agree to remove the Covenants, on the condition that both the Gathercoles, and the Plaintiffs, as the future buyers of the Anderson Property, provide written assurance that neither of them would oppose his intention to build a 10,000 square foot barn on lot 5, as well as another house on lot 4A.

23.    That letter was not shared with either the Plaintiffs, or Mr. Selkowitz, and Mrs. Gathercole did not seek any such written assurance from the Plaintiffs.

24.    Apparently, Mrs. Gathercole believed, correctly, that if the Plaintiffs had been aware of the Baltenspergers' development intentions for the properties they owned, the Plaintiffs would not have closed the transaction.

25.    Jo Gathercole responded to Mr. Baltensperger's request with a letter dated August 2, 2005. She stated "Once the covenants are nullified there should be no opposition to planned

**Anderson v. Gathercole et al., Complaint**

4

projects on your properties...." She further stated that she and Bob Gathercole "have no problem with the barn...."

26.    Jo Gathercole did not share her August 2, 2005 letter to Mr. Baltensperger with the Plaintiffs or Mr. Selkowitz.

27.    Subsequently, Jo Gathercole, by cover letter dated August 11, 2005, sent to Gisela Baltensperger a document that would have terminated the Covenants. The cover letter stated that the Baltenspergers' barn project "sounds very exciting."

28.    Jo Gathercole did not share her August 11, 2005 letter to Mrs. Baltensperger with the Plaintiffs or Mr. Selkowitz.

29.    Mr. Baltensperger did not return the termination of the Covenants, presumably because he had received no assurance from the Plaintiffs that they would not oppose his barn and house projects.

30.    Jo Gathercole subsequently falsely reported to Mr. Selkowitz that Mr. Baltenspergers refused to release the Covenants.

31.    At the time, the Plaintiffs were mildly disappointed that the Covenants could not be lifted because it meant that they could not make even a small addition to the home they intended to purchase, which itself is quite small. Nonetheless, the Plaintiffs wished to purchase the Anderson Property. Therefore, through Mr. Selkowitz and Mrs. Gathercole, the Plaintiffs negotiated a reduction in the purchase price of their property, in the amount of $10,000.

32.    The transaction closed on August 23, 2005.

## B. The Gathercoles Enlist the Plaintiffs to Hire an Attorney to Fight the Baltenspergers' Barn Project

33.    In the May of 2006, Robert Baltensperger applied for a building permit for a very large horse barn on Lot 5, which permit required several variances. The Gathercoles and the Plaintiffs both submitted letters opposing the barn on Lot 5, and the building permit was denied.

34.    In approximately August of 2006, the Baltenspergers then applied for a nearly 6,950 square foot barn, this time to be located on Lot 4A, which also required a variance due to its proximity to the private road easement.

35.    The Gathercoles contacted the Plaintiffs, seeking the Plaintiffs' partnership in fighting the issuance of a building permit for the Baltenspergers' barn on Lot 4A. The Gathercoles encouraged the Plaintiffs to join them in retaining the Gathercoles' attorney, Andrea

**Anderson v. Gathercole et al., Complaint**

5

Richard of The Richard Law Firm, to represent the Gathercoles and the Plaintiffs jointly in opposition to the building permit. The Plaintiffs agreed to do so, upon the agreement of the Gathercoles to share the expense of hiring Mrs. Richard 50/50.

36.     The Gathercoles and the Plaintiffs met with Mrs. Richard near the end of August, 2006, and jointly retained her to fight the proposed Barn on Lot 4A. Mrs. Richard thereafter appeared at a Teton County Planning Commission meeting in early September to oppose the project on behalf of the Plaintiffs and the Gathercoles and submitted letters of opposition.

37.     On or about October 20, 2006, the Gathercoles informed Mrs. Richard that they would no longer share in the costs of Mrs. Richard's representation, leaving the Plaintiffs to either drop their challenge to the permit, or go it alone. Despite the financial hardship this imposed, feeling they had no option, the Plaintiffs continued to retain Mrs. Richard.

38.     The Baltenspergers' second barn proposal was similarly turned down by the County.

39.     For their third proposal, the Baltenspergers then amended that application, seeking a 6,750 square foot barn that required no variance. That application was approved by the Teton County Planning and Development Department, and a Grading and Erosion Control Permit was approved by the County Engineering Department for the project.

40.     Following that approval, on December 5, 2006, the Gathercoles and the Plaintiffs again met with Mrs. Richard, and again agreed to jointly retain Mrs. Richard. It was agreed at that meeting that the Gathercoles and Plaintiffs, through Andrea Richard, would try to negotiate an agreement with the Baltenspergers to implement new Covenants that would govern the use of lots 3, 4A and 4B going forward. Furthermore, the Gathercoles and Plaintiffs agreed to jointly retain Mrs. Richard to pursue an administrative appeal of the decision to issue the building permit.

41.     One day later, Bob and Joe Gathercole wrote to Mrs. Richard to explain that they had changed their minds about pursuing new covenants and did not wish to do so. Nonetheless, the Gathercoles reaffirmed that they wanted Mrs. Richard to pursue the zoning appeal. Mrs. Richard thereafter pursued the appeal on behalf of both the Gathercoles and the Plaintiffs.

42.     The Plaintiffs and the Gathercoles, through Mrs. Richard, first appealed the issuance of the Building Permit and the GEC permit to the Board of County Commissioners.

**Anderson v. Gathercole et al., Complaint**

6

43.     However, the Gathercoles subsequently refused to share in the expense of this fight.   When the first for invoice this work arrived from the Richard Law Office, in early February, 2007, Martha Anderson forwarded it to the Gathercoles.   The Gathercoles denied responsibility for their half.   The Gathercoles have since refused to pay for their half of the fees and costs incurred in that appeal, which were very substantial.

44.     This was the point at which the Plaintiffs and the Gathercoles parted ways. Several telephone calls between Martha Anderson and the Gathercoles only angered the Gathercoles, resulting in increasingly hostile and aggressive behavior toward the Plaintiffs, as described in greater detail below.

45.     The Plaintiffs, fearing for their property value if the barn were built, saw no choice but to proceed with their challenge to the building permits and went on without the Gathercoles.

46.     The Board of County Commissioners held a contested case hearing on March 6, 2007, and affirmed the issuance of the two permits by decision issued June 12, 2007.   The Plaintiffs thereafter sought judicial review of the Board's decision in the District Court for Teton County.

47.     The District Court upheld the Board's determination.

48.     The Plaintiffs appealed that decision to the Wyoming Supreme Court.   The Wyoming Supreme Court similarly upheld the Board's determination, finding, among other things, that the Board had no authority or obligation to enforce private restrictive Covenants.

49.     Meanwhile, on February 8, 2007, the Baltenspergers sued Clinton Kew and Jan Kew (the sellers of the Anderson Property) as well as the Plaintiffs.   The Complaint sought a Declaratory Judgment that the Covenants which prohibited construction of the Baltensperger barn had been terminated and permitting the Baltenspergers to construct their proposed barn on Lot 4A.

50.     The Plaintiffs continued to retain The Richard Law Office to defend them in that suit, and to bring counterclaims against the Baltenspergers.

51.     In the course of litigating that case with the Baltenspergers, the correspondence between Mr. Baltensperger and Mrs. Gathercole regarding his intended building projects was revealed.   As stated above, such correspondence included: (1) Mr. Baltensperger's July 30, 2005

letter addressed to Windermere Real Estate, in which Mr. Baltensperger stated that he would agree to remove the Covenants, on the condition that both the Gathercoles, and the Plaintiffs provide written assurance that neither of them would oppose his intention to build a 10,000 square foot barn on lot 5, as well as another house on lot 4A; (2) Jo Gathercole's response to Mr. Baltensperger's request, dated August 2, 2005, stating that "there should be no opposition to the planned projects on your properties" and that she and Bob Gathercole "have no problem with the barn"; and (3) Jo Gathercole's August 11, 2005 letter, stating that the Baltensperger's barn project "sounds very exciting."

52.    The Plaintiffs first learned that the Baltensperger/Gathercole correspondence had not been shared with Peter Selkowitz, the intermediary through whom they had communicated with the sellers and Jo Gathercole, in January, 2008. At that time the Plaintiffs showed Mr. Selkowitz the correspondence, and asked him if it had been provided to him at the time the parties were negotiating the contract to purchase the Anderson Property. Mr. Selkowitz confirmed that the correspondence had not been provided to him.

## C.    The Gathercoles Begin Intimidating the Plaintiffs and Impede Their Access To Their Property

53.    The billing dispute concerning attorneys fees quickly caused the Gathercoles to cease all communication with the Plaintiffs and behave in an increasingly hostile and aggressive manner toward the Plaintiffs. The Gathercoles' actions far exceed the bounds of civilized and acceptable behavior.

54.    For example, Bob Gathercole, on numerous instances, has threatened and intimidated the Plaintiffs with his vehicle. On several occasions, when Mrs. Anderson has been walking her dog on the parties' shared access road, Mr. Gathercole has sped up and spun his tires in an obvious attempt to intimidate Mrs. Anderson while passing her.

55.    In other instances, also when the Plaintiffs have been walking their dogs on the Road, Bob and Jo Gathercole, when driving in the opposite direction, veer over into the oncoming lane, hang out of out their window, and glare in a threatening manner at the Plaintiffs.

56.    On another occasion, when both Mrs. Anderson and Bob Gathercole were driving down Fall Creek Road in opposite directions, Bob Gathercole swerved his vehicle across the road into the oncoming traffic lane and headed directly for Mrs. Anderson.

**Anderson v. Gathercole et al., Complaint**

57.   Mr. Gathercole, standing a few feet from the Anderson's driveway, has also frequently set up an archery target and performed target practice, while glaring in the direction of the Plaintiffs' home.

58.   This intimidation has also included actions by the Gathercoles to constrict the right-of-way to the Anderson Property.

59.   The Country Estates subdivision is served by a private road, W. North Fork Fall Creek Road (the "Road"). The Road lies in a defined 60' wide easement that crosses the Gathercoles' property.

60.   The Road is in poor condition, a state deliberately exacerbated by the actions of the Gathercoles. Mr. Gathercole has threatened that if anyone tries to repair the road on his property, there would be a physical altercation.

61.   In 2007, the Gathercoles built a guest house on their property, which spans the Road. While their main home lies on the southern side of the Road, the guest house was built across the Road, on the northern side.

62.   In September, 2007, in order to provide utility connections to the guest house location, several trenches were dug across the Road.

63.   Following utility installation, the trenches were poorly backfilled. Shortly after the trenches were backfilled, Ernie Anderson was driving on the Road when one of the backfilled trenches collapsed. The Plaintiffs' truck and camper fell into the resulting depression, causing in excess of $700 damage to the Plaintiffs' vehicle, which had to be towed out.

64.   The second trench similarly failed in the Spring of 2008. This left another large depression in the Road.

65.   To avoid this depression in the Road, drivers, including the Plaintiffs and others, began driving around it on the shoulder of the Road, but well within the 60' easement.

66.   In response, the Gathercoles erected numerous wooden fence posts on either side of the depression, thereby forcing drivers to drive through the depression.

67.   The Gathercoles then mounted a security camera on top of a tall light pole that is also within the easement.

68.   This was a clear attempt to intimidate and dissuade anyone who might attempt to go around the poles or remove the obstructions.

**Anderson v. Gathercole et al., Complaint**

69.     Because the Plaintiffs and the Baltenspergers' renters are the only individuals that regularly use this portion of the road, these actions were clearly aimed at the Plaintiffs.

70.     The Gathercoles have furthermore built a raised garden enclosed by railroad ties at the front of their home.  That garden intrudes into the Road easement, narrowing the road at its most constricted point.

71.     The Gathercoles furthermore regularly park numerous vehicles within the easement, including a boat, a horse trailer, a camper, and a plow truck.

72.     In July, 2009, Bob Gatherocle placed lengths of fencing on the ground adjacent to and jutting out into the Road, within the easement, indicating his intention to build a fence and further constrict the road within the easement.

73.     The Plaintiffs have demanded that the Gathercoles remove all of these obstructions.

74.     The Gathercoles have simply ignored this demand.

**The Gathercoles Threaten to Eliminate the Anderson's Driveway Access**

75.     On July 30, 2009, three days into the jury trial in the Baltensperger case, the Plaintiffs received by mail from the Gathercoles a two-paragraph letter. The letter states as follows:

> As you are aware, your access road encroaches on our property and does not follow the deeded easement for access to your property.  We gave you permission to continue this encroachment, subject to change at our discretion.
>
> We are going to rebuild the fence around our property.  The new fence will follow the property boundary.  You need to make arrangements to access your property through the easement provided in your deed.

76.     The Plaintiffs' driveway has been in the same location since at least 1978, far in excess of the period required for an easement by prescription, or adverse possession.

77.     The Plaintiffs believe that the letter, timed as it was to coincide with the Baltensperger trial, was a further attempt to harass and intimidate them and cause emotional distress.

**The Plaintiffs Prevail in Their Case Against Baltensperger**

78.     The case between the Plaintiffs and the Baltenspergers was tried before a jury for four days from July 28, 2009 to July 31, 2009.

**Anderson v. Gathercole et al., Complaint**

79.     At the conclusion of the trial, the jury entered its verdict finding for the Plaintiffs that the Baltenspergers' barn would violate the Covenants. The jury furthermore found for the Baltenspergers on the Plaintiffs' claim that the Baltenspergers had slandered the title to their property and thus awarded the Plaintiffs no damages.

80.     In total, to date, the Plaintiffs have incurred more than $100,000 in attorneys fees to the Richard Law Firm. That amount would have been entirely avoided had the Defendant Jo Gathercole not misrepresented the Baltenspergers' intentions to develop their property, and the Baltenspergers' position in negotiating the Covenants.

## COUNT I

## FRAUD AND FRAUDULENT INDUCEMENT

## AGAINST WINDERMERE AND JO GATHERCOLE

81.     Plaintiffs repeat and incorporate as though fully set forth herein, each and every allegation contained in paragraphs 1 through 80 above.

82.     Defendant Windermere's sales agent, Defendant Jo Gathercole has defrauded the Plaintiffs while acting in her professional capacity as an agent of Windermere.

83.     Defendant Jo Gathercole intentionally made fraudulent representations to the Plaintiffs and Peter Selkowitz in order to induce the Plaintiffs to close on their purchase of the Anderson Property.

84.     First, Defendant Jo Gathercole advised the Plaintiffs that no building could occur in the meadow on Lot 4A, when she was well aware of the Baltenspergers' intention to build on that lot.

85.     Second, and more importantly, Defendant Gathercole told the Plaintiffs, and Peter Selkowitz, that the Baltenspergers would not release the Covenants, when in fact that was not Baltenspergers' position at all. On the contrary, the Baltenspergers would have agreed to do so if the Plaintiffs had agreed not to fight his barn plan for Lot 5 and the house he then had planned for Lot 4A.

86.     Had that fact been communicated to the Plaintiffs, they would have furthered their negotiations with the Baltenspergers before closing on the transaction. If no agreement could then have been reached, the Plaintiffs, having been made fully aware of the Baltenspergers' intention to develop their neighboring properties, would not have closed on the transaction.

**Anderson v. Gathercole et al., Complaint**

Either way, the Plaintiffs would have avoided entirely any dispute over the Baltenspergers' proposed barn.

87.     Having no reason to doubt the veracity of Jo Gathercole's statement that the Baltenspergers would not agree to remove the Covenants, the Plaintiffs reasonably relied on this representation.

88.     Jo Gathercole, as an agent working for Defendant Windermere, committed this fraud because she wanted to close the Plaintiffs' purchase of the Anderson Property, and thereby collect her real estate commission.

89.     Upon information and belief, Jo Gathercole furthermore was simultaneously selling another property to the Kews, the sellers of the Anderson Property, and therefore needed the Anderson Property transaction to close in order to collect that sales commission as well.

90.     The Plaintiffs have been harmed by these false representations, incurring significant costs to defend themselves against the Baltenspergers' lawsuit, and to challenge the building permits sought by the Baltenspergers. The Plaintiffs have been forced to refinance their home to pay their legal fees arising out of the dispute with the Baltenspergers, thus incurring very substantial financing costs as well.

91.     The Plaintiffs seek to recover from Jo Gathercole and Windermere all of the monedatary damages they have suffered as a result of Jo Gathercole and Winderemere's fraud and fraudulent inducement, and to recover punitive damages as well for that fraud.


## COUNT II

### FRAUD AND FRAUD IN THE INDUCEMENT

### AGAINST ROBERT AND JO GATHERCOLE

92.     Plaintiffs repeat and incorporate as though fully set forth herein, each and every allegation contained in paragraphs 1 through 91 above.

93.     Robert and Jo Gathercole enlisted the support and partnership of the Plaintiffs in fighting the permit applications made by the Baltenspergers. The Gathercoles fraudulently induced the Plaintiffs to retain the Gathercoles' attorney, Andrea Richard, to jointly represent the two couples.

**Anderson v. Gathercole et al., Complaint**

94.    The Gathercoles twice promised that they would share the costs of retaining Mrs. Richard equally with the Plaintiffs.

95.    The Gathercoles did so despite the fact that they had no intention to honor their commitment to share the costs and attorneys fees incurred.

96.    The Plaintiffs reasonably relied on the Gathercoles' assurance that they would share in these fees and expenses, believing that it was in the Gathercoles' interests as well to prevent the Barn from being constructed.

97.    The Gathercoles did so without first disclosing Jo Gathercole's prior representations to the Baltenspergers that the Barn was "very exciting" and that the Gathercoles had no opposition to the Barn.

98.    As a result of this fraudulent inducement, the Plaintiffs were drawn into a protracted legal battle that has cost them both financially and emotionally.

99.    Plaintiffs seek to recover from the Gatehrcoles all of their monetary damages that resulted from this fraud and fraudulent inducement, as well as punitive damages.


## COUNT III

## NEGLIGENT MISREPRESENTATION AND PROFESSIONAL MALPRACTICE
## AGAINST JO GATHERCOLE AND WINDERMERE

100.    Plaintiffs repeat and incorporate as though fully set forth herein, each and every allegation contained in paragraphs 1 through 99 above.

101.    Real Estate brokers and salespersons in the State of Wyoming are licensed by the State and required to meet high standards of honest, integrity, trustworthiness and competency.

102.    Real Estate brokers representing sellers, as Jo Gathercole and Windermere were in this instance, are obligated to disclose to a potential buyer all of the facts pivotal to the transaction from the buyer's perspective.

103.    The fact that Robert and Gisela Baltensperger were willing to negotiate the removal of the Covenants with the Plaintiffs was a fact pivotal to the transaction from the perspective of the Plaintiffs.

104.    The fact that Robert and Gisela Baltensperger intended to build a 10,000 square foot barn on Lot 5, and a new home on Lot 4A, was a fact pivotal to the transaction from the perspective of the Plaintiffs, and directly contrary to representations made by Jo Gathercole.

105.    These facts were communicated, in writing, to Jo Gathercole and Windermere days before the transaction was set to close.

106.    Yet, Jo Gathercole, intentionally or otherwise, did not disclose to the Plaintiffs, or to Peter Selkowitz, the communications that she had had with the Baltenspergers, the Baltenspergers' willingness to remove the covenants, or the Baltenspergers' development intentions for their properties.

107.    Instead, Jo Gathercole and Windermere concealed these facts from the Plaintiffs, and affirmatively told the Plaintiffs and Peter Selkowitz that the Baltenspergers would simply not agree to remove the Covenants.

108.    The failure to disclose these communications with the Baltenspergers represents a breach of Jo Gathercole's professional obligations and duties under the law, constituting, at the very least, professional negligence.

109.    Jo Gathercole and Windermere are therefore liable to the Plaintiffs for the damages that have resulted from the failure of Jo Gathercole to adhere to the standards of professionalism that apply to Real Estate brokers and salespersons in the State of Wyoming. Such damages include, but are not limited to the attorneys fees and costs incurred by the Plaintiffs in the fight over the Baltensperger barn, and their financing costs in refinancing their home to pay for that battle. Those amounts are well in excess of $250,000, an amount that will be proven at trial.

### COUNT IV

### BREACH OF CONTRACT

### AGAINST ROBERT AND JO GATHERCOLE

110.    Plaintiffs repeat and reallage, as though set forth fully herein, each and every allegation contained in paragraphs 1 through 109 set forth above.

111.    The Gathercoles twice committed to the Plaintiffs that they would share the legal fees and costs incurred by the two couples in order to fight the Baltensperger barn.

**Anderson v. Gathercole et al., Complaint**

14

112. The Plaintiffs and the Gathercoles, along with Andrea Richard, had come to a meeting of the minds regarding payment for Mrs. Richard's services. Namely, the Parties agreed that the Gathercoles and the Plaintiffs would share equally in the obligation to pay Mrs. Richard for the zoning dispute and zoning appeal relating to the Baltensperger barn.

113. The Gathercoles' promises to pay were supported by consideration, namely the Plaintiffs' mutual promise to pay.

114. The Gathercoles then breached those two agreements and refused to pay their half of the fees incurred.

115. As a result, the Plaintiffs have suffered damages, including the attorneys fees and costs that they alone had to carry as well as the financing costs incurred by them to meet this obligation. Plaintiffs seek to recover all such damages for breach of contract, an amount to be proven at trial.

**COUNT V**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**AGAINST ROBERT AND JO GATHERCOLE**

116. Plaintiffs repeat and reallege, as though fully set forth herein, each and every allegation set forth in paragraph 1 through 115 above.

117. Defendants Robert and Jo Gathercole have intentionally inflicted severe emotional distress upon Martha and Ernest Anderson.

118. The Gathercoles have engaged in a pattern of hostile and aggressive behavior that is outrageous and beyond all possible bounds of decency.

119. The Gathercoles' hostile actions toward the Plaintiffs have been atrocious and are utterly intolerable in a civilized community.

120. This pattern of hostile actions and behavior toward the Plaintiffs includes, but is not limited to: (1) intentionally driving across the centerline of both Fall Creek Road and the Road directly at the Plaintiffs; (2) damaging the Road during construction of their guest house, then refusing to repair it and instead erecting posts to channel the Plaintiffs through the resulting depression; (3) threatening a "physical altercation" with anyone who tries to repair the Road; (4) installing a light post and security camera within the right-of-way to intimidate anyone who might attempt to repair the road or remove the posts; (5) laying fence posts in the right-of-way

*Anderson v. Gathercole et al., Complaint*

15

on the Road; (6) aggressively staring at the Plaintiffs as they pass on the road; (7) speeding down the hill leading from their guest house to the Road when the Plaintiffs approach; (8) intentionally leaving a berm of plowed snow two or more feet high across the Road to impede the Anderson's access to their home; (9) Bob Gathercole rhythmically rattling his keys when he saw Martha Anderson alone in the Wilson Post Office; (10) allowing, and even encouraging, their dog to be aggressive toward the Plaintiffs as the Plaintiffs approach or pass; (11) Bob Gathercole shooting his compound bow and arrow immediately adjacent to the Plaintiffs' property while glaring at the Plaintiffs' home; and (12) delivering to the Plaintiffs, on the third day of the Baltensperger trial, a letter demanding that the Plaintiffs move their driveway.

121.    Taken together, these actions and others have made living in Red Top Meadows, next to the Gathercoles, exceedingly distressing and emotionally draining for the Plaintiffs. Martha Anderson has been forced to see a physician and a counselor concerning the anxieties caused by the Gathercoles' hostile actions and has been treated for those anxieties. Ernest Anderson has also seen a counselor to deal with the anxieties created by the Gathercoles behavior.

122.    The Gathercoles' actions far exceed the bounds of acceptable behavior, are atrocious and vexatious, and cannot be tolerated in a civilized society. Plaintiffs seek to recover monetary damages in an amount to be proven at trial, but not less than $1,000,000.

**COUNT VI**

**DECLARATORY JUDGMENT**

**TRESPASS / INTERFERENCE WITH EASEMENT RIGHTS**

**AGAINST ROBERT AND JO GATHERCOLE**

123.    Plaintiffs repeat and reallege as if fully stated herein each and every allegation set forth above in paragraphs 1 through 122.

124.    A defined-area 60' wide road and utility easement (the "Dedicated Easment") serves the lots of the Country Estates Subdivision and passes across the Gathercoles' property. The Dedicated Easement is clearly marked on the plat for the Country Estates Subdivision.

125.    The Road, an unpaved private road, follows the Dedicated Easement.

**Anderson v. Gathercole et al., Complaint**

16

126. The Dedicated Easement is the Plaintiffs' and Baltenspergers' sole means of access to their properties from Fall Creek Road.

127. The Gathercoles have systematically and intentionally attempted to diminish and retake the Dedicated Easement for the Road in a piecemeal fashion.

128. The Gathercoles have placed permanent structures and other objects within the access easement that interfere with the Plaintiffs' right to full and unfettered use of the easement.

129. The Gathercoles' actions in this regard include: (1) building their raised garden, enclosed by railroad ties, within the easement; (2) parking boats, campers and other vehicles in the easement; (3) damaging the road during construction of their guest house and excavation of utility trenches and then failing to repair those trenches properly; (4) installing fence posts intended to channel drivers through the depression caused by their excavation activities; (5) installing a security camera on top of a tall light post, within the easement, to dissuade anyone from removing the fence posts and; (6) laying out fencing within the easement and leaving fence posts within the road itself.

130. The Plaintiffs, through their attorney, have demanded that the Gathercoles remove these obstructions. The Gathercoles have not even responded to this demand.

131. The Plaintiffs therefore seek a declaratory judgment that the Gathercoles may place no structures or objects within the Dedicated Easement and a mandatory injunction directing the Gathercoles to remove all structures and objects from the Dedicated Easement and to repair the damage that they have caused to the road.

**COUNT VII**

**ACTION FOR DECLARATORY JUDGMENT AND TO QUIET TITLE**

**ADVERSE POSSESSION**

**AGAINST ROBERT AND JO GATHERCOLE**

**Anderson v. Gathercole et al., Complaint**

17

132.   Plaintiffs repeat and reallege as if fully set forth herein, each and every allegation contained in paragraphs 1 through 131 above.

133.   Plaintiffs, and previous owners of Lot 4B have maintained actual, open, notorious, exclusive and continuous possession of the driveway accessing their property, in its current location, for a period in excess of ten years.   This possession was hostile and under a claim of right or color of title.

134.   Plaintiffs and the previous owners of Lot 4B have made physical entry on the land and performed acts of dominion on the land of such kind and manner as to indicate plainly that they were acting as the owner of that land would act.

135.   Therefore, the Plaintiffs have acquired title to that portion of their driveway area that encroaches on Lot 3 of the Country Estates Subdivision by adverse possession.

136.   The Plaintiffs are in possession of the driveway area as required to maintain a quiet title action by Wyoming Statutes § 1-32-201.

137.   Defendants Robert and Jo Gathercole, as the owners of the contiguous property, Lot 3 of the Country Estates Subdivision, claim or may claim some right, title, estate, or interest adverse to the title of the Plaintiffs.

138.   Therefore, the Plaintiffs seek a judgment quieting title in the land underneath their driveway in the Plaintiffs and a permanent injunction barring the Gathercoles from interfering with the Plaintiffs' use of their driveway.

### COUNT VII

### ACTION FOR DECLARATORY JUDGMENT

### EASEMENT BY PRESCRIPTION

### AGAINST ROBERT AND JO GATHERCOLE

139.   Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation set forth in paragraphs 1 through 138 above.

140.   The Plaintiffs' driveway, in its current location, has been used by the owners of the Anderson Property in a manner adverse to the ownership interest of the Gathercoles and the previous owners of Lot 3 for a continuous and uninterrupted period of time in excess of 10 years.

141.   That use was of such a nature as to put the Gathercoles and the previous owners of Lot 3 on notice of the adverse claim of right.

**Anderson v. Gathercole et al., Complaint**

18

142.    Neither the Gathercoles, nor any previous owner consented to or gave their permission to use the driveway at any time.

143.    However, now, the Gathercoles have stated their intention to fence their property, thus cutting off the Plaintiffs' access to their property and use of their driveway.

144.    By letter dated July 27, 2009, the Gathercoles have advised the Plaintiffs that the Plaintiffs must relocate their driveway to accommodate the Gathercole's desire to fence their property.

145.    Plaintiffs therefore seek a declaratory judgment that they have acquired an easement by prescription that permits them to leave their driveway in its current location and use it in perpetuity without any interference by the Gathercoles or any subsequent owners, and a permanent injunction barring the Gathercoles from interfering with the Plaintiffs' use of their driveway.

**COUNT VIII**

**ACTION FOR DECLARATORY JUDGMENT**

**IRREVOCABLE LICENSE**

**AGAINST ROBERT AND JO GATHERCOLE**

146.    Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation set forth in paragraphs 1 through 145 above.

147.    Prior to selling the Anderson Property to the Plaintiffs, in her capacity as the Sellers' listing agent, Jo Gathercole never once stated that the driveway on the Anderson Property encroached on the neighboring lot – her lot.

148.    On the contrary, Jo Gathercole, in her capacity as the selling agent for the Anderson Property, prepared a Property Disclosure Statement, which was then signed by her client, the seller.   Among many questions on that document is the question: "Are there any encroachments?" The answer given, as prepared by Defendant Jo Gathercole, was "no."

149.    Relying on Jo Gathercole's representations, and the expectation that they would be able to use the driveway to their home, the Plaintiffs purchased the Anderson Property.

150.    Plaintiffs have acquired an irrevocable license to use the area of their driveway that passes over the Gathercoles' property.

**Anderson v. Gathercole et al., Complaint**

19

151. Now, by letter dated July 27, 2009, the Gathercoles have asserted that the driveway for the Anderson Property encroaches on their land.

152. Even assuming that the driveway does not belong to the Plaintiffs by adverse possession, and no easement by prescription applies, in the circumstances here, equitable estoppel should apply to preclude the Gathercoles from claiming any right to revoke the Plaintiffs' right to use the driveway.

153. Therefore, Plaintiffs seek, in the alternative, a declaratory judgment that they have obtained an irrevocable license to use their driveway, and an injunction barring the Gathercoles from taking any action to interfere with that license.

**COUNT IX**

**BREACH OF THE IMPLIED COVENANT OF**

**GOOD FAITH AND FAIR DEALING**

**AGAINST ROBERT AND JO GATHERCOLE**

154. Plaintiffs repeat and reallege as though fully set forth herein each and every allegation set forth in paragraphs 1 through 153 above.

155. By their actions set forth above, the Gathercoles have breached the duty of good faith and fair dealing implied in every Wyoming contract.

156. The Gathercoles, by defrauding the Plaintiffs, breaching their contract with the Plaintiffs, then relentlessly harassing and intimidating them, have breached community standards of decency, fairness and reasonableness.

157. The Gathercoles' actions have prevented the Plaintiffs from receiving the benefits of their agreement to purchase the Anderson Property: i.e. the right to the quiet enjoyment of their property.

158. The Plaintiffs therefore seek a monetary award that will make them whole for the financial losses they have suffered due to the Gathercoles' actions.

WHEREFORE, the Plaintiffs hereby request the Court enter a judgment granting the following:

    A. Declaratory judgment in the Plaintiffs' favor declaring that: (1) the Gathercoles may place no permanent or temporary structures or objects within the dedicated 60' foot easement for W. North Fork Fall Creek Road; (2) quieting title in the Plaintiffs to the

**Anderson v. Gathercole et al., Complaint**

20

portions of their driveway that fall upon Lot 3 of the Country Estates Subdivision, or, in the alternative, a declaration that the Plaintiffs may leave their driveway in its current location by virtue of the easement by prescription or irrevocable license they have obtained; and

B.  An award of monetary damages to the Plaintiffs from Robert and Jo Gathercole as follows: (1) for breach of contract in an amount to be determined at trial but no less than $250,000; (2) for fraud in an amount to be determined at trial but no less than $1,000,000; (3) for intentional infliction of emotional distress in an amount to be determined at trial but no less than $1,000,000; and (4) for breach of the implied covenant of good faith and fair dealing, damages to be determined at trial but no less than $250,000; and

C.  An award of monetary damages to the Plaintiffs against Jo Gathercole and Windermere as follows: (1) for fraud and fraudulent inducement in an amount to be determined at trial no less than $1,000,000; (2) for negligent misrepresentation and professional malpractice in an amount no less than $1,000,000; and

D.  A permanent mandatory injunction: (1) commanding the Defendants Robert and Jo Gathercole to remove all structures and objects from the dedicated easement for W. North Fork Fall Creek Road and repair those portions of the Road that were damaged by the Gathercoles' excavation work; and (2) ordering the Defendants Robert and Jo Gathercole to cease and desist their acts of intimidation directed toward the Plaintiffs; and

E.  An award of Plaintiffs' costs and attorneys fees incurred in prosecuting this action.

Plaintiffs respectfully request that this case be tried to a jury of 12.

DATED: December 31, 2009.

Mark D. Sullivan
Wyoming Bar #6-3824
Mark D. Sullivan, P.C.
5237 HHR Ranch Road
Wilson, Wyoming 83014
Mark@mdslawoffice.com
P- (307) 733-2021
F- (307) 732-9807

**Anderson v. Gathercole et al., Complaint**

21